Robert Mackey (SBN 125961)
**LAW OFFICES OF ROBERT MACKEY**
660 Baker Street
Building A, Ste. 201
Costa Mesa, CA 92626
Telephone: (412) 370-9110
*bobmackeyesq@aol.com*

Matthew A. Smith (SBN 309392)
**MIGLIACCIO & RATHOD LLP**
315 Montgomery Street, Suite 900
San Francisco, CA 94104
msmith@classlawdc.com
Telephone: (202) 301-3603

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

GLORIA FURNARI, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

ANDERSEN WINDOWS, INC.,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Gloria Furnari ("Plaintiff" or "Furnari"), individually and on behalf of all those similarly situated, files this proposed class action suit against Defendant Andersen Windows, Inc. ("Andersen" or "Defendant"), based upon her personal knowledge as to facts specific to her in an individual capacity and based upon the investigation of counsel in all other respects, and alleges as follows:

## I. INTRODUCTION

1. Andersen designs, manufactures, markets, distributes, and sells residential windows and doors throughout the United States, including sliding patio doors sold under the "Andersen 100 Series" product line (the "Class Doors"). Andersen markets the Class Doors as premium, durable, and weather-resistant products suitable for residential exterior installation.

2. Andersen specifically states that the Class Doors are "long-lasting, energy-efficient barrier against wind, water and dust," and further explains that their "one-piece sill-design with weep holes located on the sill exterior provides superior water management."[1]

3. Despite these representations, the Class Doors suffer from a uniform defect in the manufacturing, materials, and/or workmanship of the bottom sill (the "Sill") which causes moisture to intrude into the home. Specifically, the Class Doors utilize a U-shaped Sill that allows rainwater to accumulate in the track channel, including the interior portion of the Sill. However, rather than draining water from the Sill and preventing water from entering the home, the Sill design fails to effectively drain water and, accordingly, permits an excessive amount of water to pool inside the door, which then overflows past the interior lip of the Sill and infiltrates the home (the "Defect"). This overflowing water can cause water damage to the interior of the purchaser's home, along with potential rusting, corrosion, discoloration, or staining of parts of the Sill, such as metal door rollers or bearings.

4. Many purchasers of the Class Doors have expressed concern and disappointment with the Defect, including on Andersen's website, and on various internet forums. Andersen has responded to some of these complaints but has failed to offer to fix the Defect.

5. In normal rainfall, homeowners reasonably expect an exterior sliding patio door to prevent water intrusion into the interior living space. Instead, owners of the Class Doors experience water pooling in the Sill. In the worst cases, the water can spill into the home, causing interior water damage, including damage to flooring, subflooring, drywall, trim, and adjacent finishes. The Defect also creates conditions conducive to mold growth and other moisture-related deterioration.

---

[1] *2024-2025 Product Guide for Professionals*, at 100, Andersenwindows.com, *available at* https://www.flipsnack.com/andersenwindows/100-series-product-guide-for-professionals-ftk3q1dd0/full-view.html.

6. Andersen knew, and/or was on notice of, the Defect through pre-release testing, product engineering and design review, warranty claims, consumer complaints, installer feedback, and online reviews. Nevertheless, Andersen continued to market and sell the Class Doors without disclosing the Defect.

7. If Plaintiff and/or other Class members knew of the Defect at the time of purchase, they would not have purchased the Class Doors or would have paid substantially less for them. Plaintiff and other Class members were denied the benefit of the bargain in connection with their purchases.

8. The conduct described herein makes Defendant liable for, among other things, unfair, deceptive, and/or fraudulent business practices. In turn, owners of the Class Doors, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendant caused Plaintiff and the Class members damages, including, but not limited to, loss of value, loss of use of the Class Doors, and other repair and replacement costs, including costs associated with remediation of water intrusion and property damage.

9. Accordingly, Plaintiff brings this action to redress Defendant's misconduct. Plaintiff seeks recovery of damages under state consumer protection statutes, including the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code 1750, *et seq.*, Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, and False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, common law fraudulent concealment, and unjust enrichment.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6) because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

11. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business in this District and because Plaintiff purchased her Class Door in this District. Defendant advertised in this District and received substantial revenue and profits from sales of the Class Doors in this District. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

12. Plaintiff's venue declarations pursuant to Cal. Civ. Code § 1780(d) is attached hereto as Exhibit A.

13. This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district. Defendant has transacted and done business, and violated statutory and common law, in the State of California and in this District.

## III. PARTIES

### A. Plaintiff

14. Plaintiff Gloria Furnari was, at all times relevant hereto, a resident and citizen of the State of California. Specifically, Furnari resides in Oceano, CA.

15. On April 1, 2025, Furnari purchased two of the Class Doors from the Home Depot located at 1551 Froom Ranch Way, San Luis Obispo, CA 93405. The Class Doors purchased by Furnari cost $2,547.19, including the $79.00 delivery fee. Delivery was scheduled to her Oceano, CA home the next day.

16. The next day, April 2, 2025, Furnari had Morningstar Construction, a licensed general contractor, install the Class Doors in her Oceano, CA home. The Class Doors were installed to connect her dining room to her patio on the second floor of the home. Furnari closely monitored installation, and Morningstar Construction confirmed that they complied with all instructions provided by Andersen when installing the Class Doors. Morningstar Construction charged Furnari $1,760.06 for installation labor and materials.

17. Shortly after installation of the Class Doors, Furnari noticed that a substantial amount of water would appear on the inside track of the Class Doors when it was raining outside. This water would accumulate without her ever opening the door.

18. Furnari regularly cleaned the door and ensured the weep holes were kept clear to mitigate any water from leaking into the home.

19. Despite Furnari's diligent efforts to ensure the Class Doors' weep holes were operating properly, in winter 2025, when a rainstorm hit Furnari's Oceano, CA home, water again began to appear in the inside track of the Class Doors. So much water accumulated in the inside track that it eventually

spilled over the track and onto the rug in her dining room. At one point, she estimates there was about an inch of water from the bottom of the inside track.

20. In early 2026, Furnari attempted to get a representative from Andersen to come out to her Oceano, CA home and inspect the doors because of the persistent water build-up issue. Since her property was located in a rural area, she was advised that Andersen would charge her approximately $800 for a representative to come to her home. She refused to pay that amount for this service.

21. On February 10, 2026, Furnari was able to speak with an Andersen representative virtually via videoconference. During this call, the Andersen representative asked Furnari to show her the Class Doors and put a level next to the bottom of the door. After doing so, Andersen offered to send a representative to Furnari's home free of charge to assess the issue in person.

22. The Andersen representative came to Furnari's Oceano, CA home on March 10, 2026. The representative assessed the Class Doors and noted that he did not see any issues with installation that would cause the purported issue. Instead, the representative told Furnari that the Class Doors could not be used at a location close to the ocean because wind speeds would get too high and inhibit the ability of the Class Doors to drain water during a rainstorm, even if the weep holes were kept clean. The representative also advised Furnari that the issue was partially caused by the Class Doors facing increased exposure to wind and rain on the top floor of her property. Accordingly, the representative did not conduct any repair work and refused to accept any return of the Class Doors.

23. Furnari's Oceano, CA home continues to have the Class Doors installed to this date, and the Class Doors still have the Defect.

**B. Defendant**

24. Defendant Andersen Windows, Inc. is a Minnesota limited liability company with a principal place of business located at 551 Maine St N., Bayport, MN 55003–1049. At all times relevant to Plaintiff's claims, Andersen was and is the business entity responsible for the sale, distribution and returns of the Doors.

25. Defendant Andersen utilizes the website https://www.andersenwindows.com/ and its related webpages, as well as retailers, to market and sell windows and doors and related products

directly to consumers throughout the United States. Andersen is registered to do business in California and other states across the country.

26. Andersen employs approximately 13,000 employees and operates across the United States and North America.

## IV. SUBSTANTIVE ALLEGATIONS

### a. <u>Defendant's Misleading Marketing of The Class Doors</u>

27. Andersen consistently markets the Class Doors as premium, durable, and weather-resistant products suitable for residential exterior installation. These representations were false and misleading.

28. In the 2024-2025 Product Guide for Professionals (the "Product Guide"), a brochure offered by Andersen on its website, Andersen touts the "Superior Weather Resistance" of its 100 Series Products, including the Class Doors. The Product Guide claims: "Our weather-resistant construction seals out drafts, wind and water so well that your reputation is protected whatever the weather."[2]

29. The Product Guide also repeatedly indicates that the Class Doors are designed to be weathertight and effective at preventing water infiltration into the home. For example, the Product Guide states elsewhere:

- "Fibrex material retains its stability and rigidity in all climates, delivering exceptional durability. It makes our 100 Series products rigid and strong so the weathertight seals stay weathertight."[3]
- The Fibrex materials used to make the door are "[t]wice as strong as vinyl so weathertight seals stay weathertight."[4]

---

[2] *2024-2025 Product Guide for Professionals*, at 2, Andersenwindows.com, *available at* https://www.flipsnack.com/andersenwindows/100-series-product-guide-for-professionals-ftk3q1dd0/full-view.html.

[3] *Id.* at 3.

[4] *Id.* at 4.

- "Dual felt weatherstrip, applied to the inside pocket of both side jambs and the head jamb [of the 100 Series Patio Doors], creates a positive seal between the frame and panels. The result is a long-lasting, energy-efficient barrier against wind, water and dust."[5]
- "A glazing bead and silicone provide superior weathertightness and durability."[6]
- "A two-point locking system engages a steel receiver plate that's secured into the side jamb. This provides enhanced security and a weathertight seal, with the operating panel pulled tightly into the jamb."[7]

30. The Product Guide also makes various representations about the rigorous testing the Class Doors are exposed to with respect to water penetration. Namely, Andersen represents that the Class Doors were put through rigorous water penetration resistance testing under the ASTM E547 testing regimen.[8] The Product Guide further represents that the Class Doors are Hallmark Certified by the Window and Door Manufacturers Association ("WDMA"), meaning Andersen is subjected to inspections that "audit[] licensee quality control procedures and processes," "confirm products are manufactured in accordance with the appropriate performance standards," and periodically test – through an independent testing laboratory – "representative product constructions and components."[9]

31. With respect to the Sill specifically, Andersen claims that "[t]he one-piece sill-design with weep holes located on the sill exterior provides superior water management."[10] However, as Andersen is aware based on its testing of the Class Doors, the design of the Sill permits water to pool inside when functioning as designed, which can include pooling to a degree that overflows back into the door's inside track.

32. Below are images showing the water management features of the Sill, specifically holes on the bottom of the interior track of the Sill and "weep holes" on the exterior of the Sill. In theory, any

---

5 *Id.* at 100.
6 *Id.*
7 *Id.*
8 *Id.* at 112.
9 *Id.*
10 *Id.* at 100.

water that intrudes into the interior track of the Sill should drain through the bottom holes and exit through the weep holes to the exterior.




*Figure 1: Drain holes on the interior track*




*Figure 2: Weep holes on Sill exterior*

33. Because the Defect compromises the Class Doors' ability to prevent water infiltration into the home, the Class Doors are not fit for their intended purpose as moisture and weather barriers and cannot satisfy the representations Andersen made in its marketing materials.

34. Andersen appears to be unable to repair the Defect in the Class Doors, as shown by its failure to do so for Plaintiff. Accordingly, the only option purchasers currently have is replacement.

35. Many Class Door owners, like Plaintiff, have communicated with Andersen's employees and agents to request that Andersen remedy or address the Defect and/or any resultant damage at no expense to them, but Andersen has failed or refused to do so.

36. Had Plaintiff and Class members known about the Defect at the time of purchase, they would not have bought the Class Doors or would have paid substantially less for them.

**b. Andersen's Exclusive and Early Knowledge of the Defect**

37. Prior to releasing the Class Doors for sale, Andersen was in a superior position to know and did in fact know of the Defect and the effects thereof on the quality, reliability, and functionality of the Class Doors.

38. Plaintiff and those similarly situated did not, and could not, unravel Andersen's pattern of deception and public silence.

39. Andersen owed Plaintiffs and all those similarly situated a duty to disclose the Defect because Defendant knew that the Class Doors possessed defective water management features before they were released to the market. Defendant did not, however, disclose this information to consumers who were making their purchasing decisions. A reasonable consumer would assume that a door marketed as "provid[ing] superior water management" would be able to prevent moisture from freely intruding into the interior of the home.

***i. Andersen's Knowledge of the Defect Prior to Release***

40. Andersen knew or should have known about the Defect due to its extensive quality controls and pre-release testing processes.

41. Andersen, like any product manufacturer, tests its products prior to release. Andersen claims, among other things, that its products are generally "[t]ested to withstand the test of time[.] Our

standards for quality are high, and our rigorous testing backs this up."[11] Andersen further represents that it "test[s] to exceed industry standards," including "air and water infiltration testing."[12]

42. As stated previously, Andersen also specifically represents in the Product Guide that it tested the Class Doors for water filtration pursuant to the ASTM E547 testing regimen and it implemented regular quality control and testing measures in order to secure WDMA Hallmark Certification.[13]

43. Accordingly, Andersen conducted extensive testing on the Class Doors and each of their components, including the Sill. Complete data on such testing is exclusively within Andersen's control and unavailable to Plaintiffs without discovery.

44. Andersen's pre-release testing would have revealed the Defect. For example, tests to simulate consumer experience, including real-life user studies and water penetration tests, would have revealed the Defect. Because the Defect manifests during foreseeable normal consumer use, Andersen's purportedly rigorous testing would have revealed that the Class Doors suffer from the Defect during normal and foreseeable use by consumers.

***ii. Andersen's Knowledge of the Defect After Release***

45. Defendant knew or should have known about the Defect due to post-release failure analyses, internet reviews, consumer complaints, warranty claim data, and repair data.

46. Andersen, like other home hardware companies, collects, reviews, and analyzes detailed information about repairs requested or made on doors still under warranty at its retail locations, repair centers, and third-party service centers, including the type and frequency of such repairs. Complete data on such repairs is exclusively within Andersen's control and unavailable to Plaintiffs without discovery.

---

[11] *Quality*, Andersenwindows.com, *available at* https://www.andersenwindows.com/about/quality#reliability.

[12] *How Our Windows are Tested*, Andersenwindows.com, *available at* https://www.andersenwindows.com/for-professionals/pro-views/how-our-windows-are-tested.

[13] *2024-2025 Product Guide for Professionals*, at 112, Andersenwindows.com, *available at* https://www.flipsnack.com/andersenwindows/100-series-product-guide-for-professionals-ftk3q1dd0/full-view.html.

47. Though Andersen's repair data is not publicly accessible, it is apparent from publicly available data that a significant percentage of Class Door owners have sought repairs for the Defect from Andersen.

48. Defendant would have been made aware of the Defect due to the large number of repairs or repair requests made during the Class Doors' warranty period.

49. Defendant also monitors the internet for articles, comments, and posts made about the Defect. At a minimum, Defendant reviews on a regular basis the comments posted to its own website (andersenwindows.com) for problems with its products.

50. Online reputation management ("ORM") is now a standard business practice among most major companies, including Andersen, and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on consumer services. "Specifically, [ORM] involves the monitoring of the reputation of an individual or brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individual's or brand's reputation."[14]

51. Thus, Andersen reports on social media data reflecting negative consumer experiences, has a strong presence on various popular internet platforms, and carefully curates the reputation of its brand and products online.

52. From previous litigation, Andersen is aware that consumers provide feedback about its products not only on its website, but also on popular social media sites such as Twitter, YouTube, and Reddit. Andersen thus accounts for consumer online behavior in its ORM strategy.

53. As discussed below, numerous online reviews and posts discussing the Defect made or should have made Defendant aware of the Defect.

54. First and foremost, Andersen was or should have been aware of the Defect from the complaints posted to its own website that its own agents responded to. On the Class Doors product page there are numerous comments from customers complaining of the impact of the Defect on their Class Doors. The following are representative:

---

[14] *Online Reputation*, WebSolutions, available at https://websolutions-maine.com/online-reputation/ (last accessed Oct. 20, 2022).

Example #1:

A customer posted: "Confused re water inside house on track after a small rainfall. Water sits in track and doesn't empty completely through weep holes. Everything clean; no blockage. Notice that frame outside of window is not sealed, but loose. Is this correct?"

Andersen replied to this complaint: "Thank you for your inquiry. We would like to gather more details and possibly pictures to better answer your question. Please give us a call at 1-888-888-7020 and someone will be able to assist."[15]

Example #2:

Another customer posted: "We just had our patio door installed. Help me understand the water on the inside track. It makes no sense-where does this water go??????"

Andersen replied: "Thank you for your inquiry. Andersen's 100 Series gliding patio doors has a one-piece sill design with weep holes located on the sill's exterior; this water management design allows water to flow out to the exterior."[16]

Example #3:

Another customer posted: "Only disappointment is that after rain, water still collects in channels and doesn't dissipate after 2 days thereby I must remove manually to avoid possibility of interior carpet being compromised. The weep holes are clear and functioning so this should not happen. Disappointed."

Andersen did not reply to this post.[17]

Example #4:

Another customer posted: "Inside Water. No mention anywhere of water running from bottom of right movable panel down center track to left weep hole on inside of door. A lot of water comes through. if weep hole got plugged would have water on floor. Door is level within 1/16 inch. Is Series 100 door."

---

[15] *Product Page, 100 Series Gliding Patio Door*, andersenwindows.com, *available at* https://www.andersenwindows.com/windows-and-doors/doors/sliding-patio-doors/100-series-gliding-patio-door.

[16] *Id.*

[17] *Id.*

Andersen did not reply to this post.[18]

Example #5:

Another customer posted: "Poor Design. Every time it rains, the inside track fills with water, apparently this is by design. Horrible!! Screen door is so flimsy it flexes so you cannot even shut it from the inside with the 'handle' it has."

Andersen replied: "Thank you for your review. Andersen's 100 Series gliding patio door is designed with a contain and drain system to have water from heavy rains drain away from your home. Thank you for your feedback regarding the screen door."[19]

Example #6:

Another customer posted: "Allow water from outside, into the home. I am deeply disappointed in this product and wish I had never bought them. There are two new 100 series gliding patio doors installed in our house (9/2019), one upstairs and one downstairs. It rained the first day that they were installed and rain water pooled in the tracks in both locations and stayed there for days. I've complained to both Andersen and the installer and they both have gone to great lengths to explain to me how the 'contain and drain' system works, and that yes, some rain water will be in my tracks, inside the house and yes, all sliding doors do this. The installer has come out multiple times to adjust and shim the tracks, but we still have water in the tracks after the adjustments, after it rains (but admittedly there is less pooling). These new patio doors replaced 40 year old Pella patio doors. We never saw water inside our house, past the old Pella doors, so I don't understand how the new technology allows water in, but the old competitor's technology from 40 years ago, does not. It blows my mind that allowing rainwater inside the house is acceptable to Andersen and is actually 'by design.' I feel sick when I think about how much money I spent. When I was shopping out this project I got a quote for literally half the price, but didn't choose them because I wanted a good, reputable product. I deeply regret choosing the Andersen product. I would never recommend 100 Gliding Patio Doors."

Andersen replied: "I am sorry to hear about your disappointment. The contain and drain system has been used extensively on patio doors. I do apologize if this wasn't explained to you prior to your purchase. Thank you for reaching out."[20]

[18] *Id.*
[19] *Id.*
[20] *Id.*

55. Other consumers have complained on other online forums about Andersen patio doors from the same time period experiencing leaking problems in the Sill.[21]

56. Despite Defendant's awareness of the Defect and the wealth of information provided by disgruntled customers, Andersen has failed to reveal, repair, prevent or adequately respond to the Defect.

57. Defendant knew that prevention of water intrusion was, and continues to be, a material factor for consumers purchasing a Class Door.

58. Andersen concealed from and/or failed to disclose to the public at large—including the Plaintiff and the Class—the defective nature of the Class Doors and failed to remove the Class Doors from the marketplace or take adequate action to remedy the Defect. Rather, Andersen sold and serviced the Class Doors even though it knew, or was reckless in not knowing, that the Defect impacted the waterproofing of the Class Doors and would ultimately result in the Class Doors failing to satisfy their intended purpose.

59. Moreover, Defendant's omissions are accompanied by affirmative misrepresentations as to the Class Doors' water management, as detailed above.

**d. <u>FRAUDULENT CONCEALMENT ALLEGATIONS</u>**

60. Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Andersen responsible for disseminating false and misleading marketing materials regarding the Class Doors. Andersen necessarily is in possession of all of this information. Plaintiff's claims arise out of Andersen's fraudulent concealment of the Defect and the failures and malfunctions it causes, and Defendant's representations about the premium quality,

---

[21] *See, e.g., Renewal by Andersen Louisville*, Better Business Bureau, https://www.bbb.org/us/ky/louisville/profile/windows/renewal-by-andersen-louisville-0402-12001706/customer-reviews (including a review from March 12, 2026, stating "Our patio doors were installed in 2023 and they have leaked since then. Renewal by Andersen has come out to 'fix' them at least 4 times and they continue to leak. When it rains hard, water is running into the house onto our wood floors causing them to warp. We have tried to remain patient, but after three years of continuously having water run into our house through the new doors, our patience has run out. I do not recommend Renewal by Andersen Louisville because either their product and/or workmaship is inferior."); *Andersen defective leaking rain sliding doors Sill 2*, Youtube, https://www.youtube.com/watch?v=24Dz6GAg1dc (last accessed May 28, 2026).

effectiveness, and weather resistance of the Class Doors themselves. To the extent that Plaintiff's claims arise from Andersen's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases her claims.

61. Plaintiff alleges that at all relevant times, including specifically at the times she purchased her Class Doors, Andersen knew, or was reckless in not knowing, of the Defect; Andersen was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and Andersen never disclosed the Defect to Plaintiff or the public at any time or place or in any manner.

62. Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Andersen:

63. ***Who:*** Andersen actively concealed the Defect from Plaintiff and Class members while simultaneously touting the ability of the Class Doors to reliably protect purchasers from water intrusion, as alleged herein. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Andersen responsible for such decisions.

64. ***What:*** Andersen knew, or was negligent or reckless in not knowing, that the Class Doors contain the Defect, as alleged herein. Andersen concealed the Defect and made representations about the premium quality, effectiveness, weather resistance, and other valuable attributes of the Class Doors, as specified above.

65. ***When:*** Andersen concealed material information regarding the Defect at all relevant times and made representations about the superior quality, effectiveness, and weather resistance of the Class Doors, starting as early as 2019, or at the subsequent introduction of certain models of Class Doors to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above. Andersen still has not disclosed the truth about the Defect in the Class Doors to anyone outside of Andersen. Defendant has never taken any action to inform consumers at large about the true nature of the Defect in the Class Doors. And when consumers brought their Class Doors to Andersen complaining of the Defect, Andersen denied any knowledge of or responsibility for the Defect, and in many instances (as detailed above) outright denied the existence of a problem.

66. ***Where:*** Andersen concealed material information regarding the true nature of the Defect in every communication it had with Plaintiff and Class members and made representations about the premium quality, effectiveness, and weather resistance of the Class Doors. Plaintiffs are aware of no document, communication, or other place or thing, in which Andersen disclosed the truth about the Defect in the Class Doors to anyone outside of Andersen. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Andersen's website.

67. ***How:*** Andersen concealed the Defect from Plaintiffs and Class members and made representations about the premium quality, effectiveness, and weather resistance of the Class Doors. Andersen actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer. Andersen promised in its marketing materials that Class Doors have qualities that they do not have.

68. ***Why:*** Andersen actively concealed material information about the Defect in the Class Doors for the purpose of inducing Plaintiffs and Class members to purchase Class Doors, rather than purchasing competitors' glass doors, and made representations about the premium quality, effectiveness, and weather resistance of the Class Doors. Had Andersen disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class members (all reasonable consumers) would have been aware of it and would either pay less for the Class Doors or not bought them at all.

**e. <u>TOLLING OF STATUTE OF LIMITATIONS</u>**

69. Any applicable statute(s) of limitations have been tolled by Andersen's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

70. In addition, even after Plaintiffs and Class members contacted Andersen for repairs to their Class Doors related to the Defect, they were routinely told by Andersen that the Class Doors were

not defective and that such pooling was to be expected as the contain and drain system is used extensively on patio doors.

71. Andersen was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality, and nature of the Class Doors. As a result of Andersen's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**f. <u>CLASS ACTION ALLEGATIONS</u>**

72. Plaintiffs bring this lawsuit on behalf of themselves and all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3). The Classes are defined as follows:

> **Nationwide Class:** All persons in the United States who purchased a Class Door within the applicable statute of limitations period.
>
> **California Class:** All citizens of California who purchased a Class Door within the applicable statute of limitations period.

73. Plaintiffs and Class members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence.

74. Excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) Defendant and its parents, subsidiaries, affiliates, successors, assigns, officers, directors, or employees; (c) anyone employed by counsel for Plaintiff in this action; and (d) all persons who properly execute and file a timely request for exclusion from the Class.

75. The proposed classes are ascertainable because they are defined by reference to objective criteria. In addition, the names and addresses of all members of the proposed class can be identified in business records maintained by Defendant and third-party retailers.

76. ***<u>Numerosity</u>*****:** Members of the Class are so numerous that their individual joinder is impracticable. Moreover, the Class is composed of an easily ascertainable, self-identifying set of individuals and entities who purchased Class Doors. The precise number of Class members can be ascertained through discovery, which includes Defendant's records. Plaintiff estimates the number of Class members to be in at least the tens of thousands based on the size of Andersen's operations and its

substantial market share in the window and door manufacturing industry.[22] The disposition of Plaintiff's claims through a class action will benefit both the parties and this Court.

77. ***Commonality*:** There are questions of law and fact common to the Class that will materially advance the litigation, and these common questions predominate over any questions affecting only individual Class members. Among the questions common to the Class are:

- Whether the Class Doors suffer from the Defect;
- What were the origins of the Defect in the Class Doors;
- What led to implementation of, and, if any, the justification for, Andersen's designs, protocols, and technologies relating to the Defect and its manifestation in the Class Doors;
- When did Andersen become aware of the Defect in the Class Doors, and how did it respond to that knowledge;
- Whether Andersen actively concealed and/or failed to notify consumers of the Defect in the Class Doors;
- Whether Andersen knew of the Defect but failed to disclose the problem and its consequences to its customers;
- Whether a reasonable consumer would consider the Defect and its consequences to be material;
- Whether Andersen's conduct violates state consumer protection laws as asserted herein;
- Whether Andersen's sale of Class Doors containing the Defect is an unfair, false, misleading, or deceptive act in the conduct of any trade or commerce;
- Whether Plaintiffs and the other Class members overpaid for their Class Doors as a result of the Defect herein;

---

[22] *Andersen Corp – Company Profile*, IBISWorld, https://www.ibisworld.com/united-states/company/full/default.aspx?entid=351862 (last accessed May 28, 2026) (noting that Andersen has a "notable market share" in the "Wood Door & Window Manufacturing" industry, and it accounts for an estimated 6.5% of total industry revenue).

- Whether Plaintiff and Class members would have purchased their Class Doors, and whether they would have paid a lower price for them, had they known that they contained the Defect at the time of purchase;
- Whether Plaintiff and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for replacement or repair of the Class Doors; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between the Class Doors as merchantable in the absence of the Defect, and as actually manufactured and sold possessing the Defect; and (iii) whether Plaintiff and the Class are entitled to all costs associated with repair and replacement of their Class Doors; and
- Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief.

78. ***Typicality*:** Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Andersen's conduct in manufacturing, marketing, advertising, warranting, selling, and/or designing the Class Doors. All of Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class members were injured in the same manner by Andersen's uniform course of conduct described herein. Plaintiff and all Class members have the same claims against Andersen relating to the conduct alleged herein, and the events giving rise to Plaintiff's claims for relief are identical to those giving rise to the claims of all Class members. Plaintiff and all Class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Andersen's wrongful conduct as described herein. Plaintiff is advancing the same claims and legal theories on behalf of herself as for all absent Class members.

79. ***Adequate Representation*:** Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, product liability, product defects, and state consumer fraud statutes.

80. ***Predominance***: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members.

81. ***Superiority***: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as individual joinder of all members of the Class is impracticable. Given the amount at issue for each Class member, individual suits would not be economically viable; however, should individual Class members bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the judicial system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## V. CAUSES OF ACTION

### COUNT I

**Violations of California's Consumer Legal Remedies Act ("CLRA")**

**(Cal. Civ. Code 1750, et seq.)**

**(On Behalf of Plaintiff and the California Class)**

82. Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

83. The Class Doors are "goods" as defined in Cal. Civ. Code § 1761(a).

84. Plaintiffs and the California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d).

85. Defendant is a "person" as defined in Cal. Civ. Code § 1761(c).

86. The purchases by Plaintiffs and California Class members are "transactions" as defined by Cal. Civ. Code § 1761(e).

87. Defendant's conduct, as described herein, was and is in violation of Cal. Civ. Code 1750, *et seq.* (the "CLRA"). Defendant's conduct violates at least the following enumerated CLRA provisions:

- § 1770(a)(4): Using deceptive representations in connection with goods;

- § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;
- § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;
- § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and
- §1770(a)(14): Representing that a transaction confers or involves obligations that it does not have.

88. Defendant is a "manufacturer" within the meaning of Cal. Civ § 1791(j).

89. Specifically, Defendant represented that the Class Doors would provide "a long-lasting, energy-efficient barrier against wind, water and dust" and "superior water management," but the Defect prevents the Class Doors from providing these promised characteristics.[23] Additionally, Defendant represented that the Class Doors are of premium quality, effectiveness, and weather resistance, when their Sills are prone to leaking water inside the homes of purchasers under ordinary use conditions.

90. Plaintiff and the Class members have suffered injury in fact and actual damages resulting from Defendant's material omissions and misrepresentations because, *inter alia*, they lost money when they purchased the Class Doors, paid an inflated purchase price for the Class Doors, or paid money for repairs and/or replacements.

91. Defendant knew, should have known, or was reckless in not knowing that the Defect in the Class Doors rendered them not suitable for their intended uses.

92. Defendant had a duty to disclose the Defect because Andersen had exclusive knowledge of the Defect and its impact on the effectiveness and weather resistance of the Class Doors prior to making sales, and because Defendant made representations about the quality, effectiveness, and weather resistance of the Class Doors but failed to disclose the Defect.

---

[23] *2024-2025 Product Guide for Professionals*, at 100, Andersenwindows.com, *available at* https://www.flipsnack.com/andersenwindows/100-series-product-guide-for-professionals-ftk3q1dd0/full-view.html.

93. Defendant further breached its duty to disclose the Defect by attempting to conceal the Defect with denials of responsibility, shifting the blame to owners or installers of the Class Doors, and refusing to repair the Defect under warranty.

94. Defendant falsely represented that its Class Doors were premium, effective, and suitable for household use as a barrier against the elements, including rainwater and outdoor moisture.

95. These representations were false and misleading because the Defect causes the Class Doors to not only fail to effectively drain water that is captured in the Sill, as promised, but it also causes water to leak inside the home, which renders the Class Doors unusable for their ordinary purposes within the useful lifespan of the Class Doors. Andersen was aware the Class Doors suffered from the Defect and that the Class Doors did not perform as advertised.

96. The facts Andersen concealed and omitted are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Doors or pay a lower price.

97. Plaintiff and Class members would not have purchased their Class Doors, or would have paid less for them, had they known that the Defect would potentially cause water to leak into their home. Had Plaintiff and the Class members known this information at the time of their purchase, they would not have purchased their Class Doors or would have purchased them at a much lower price.

98. As a result of Defendant's misconduct, Plaintiff and Class members were harmed in the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Class Doors and the price they would have paid but for Defendant's misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

99. Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated members of the Class, compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices.

100. Plaintiff further seeks an order awarding costs of court and attorneys' fees pursuant to Cal. Civ. Code § 1780(e).

101. Plaintiff provided statutory notice to Defendant of their claims pursuant to Cal. Civ. Code § 1782 on May 1, 2026.

**COUNT II**

**Violations of California's Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

**(On Behalf of Plaintiff and the California Class)**

102. Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

103. California Business & Professions Code § 17200 (the "UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Defendant engaged in conduct that violated each of the statute's three prongs.

104. Defendant committed fraudulent business acts and practices in violation of the UCL when it concealed the existence and nature of the Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Doors were, *inter alia*, of premium quality, effectiveness, and weather resistance, when, in fact, they were not. These representations were made despite Andersen's exclusive knowledge of the Defect prior to the point of sale. Andersen's representations and active concealment of the Defect are likely to mislead the public with regard to the true defective nature of the Class Doors, resulting in consumers paying an unwarranted premium for the Class Doors or buying the Class Doors when they otherwise would not have absent Defendant's deceptive representations.

105. Defendant further committed unlawful business acts or practices in violation of the UCL, by systematically the CLRA and the False Advertising Law, as alleged above and below.

106. Defendant committed unfair business acts and practices in violation of the UCL because the acts and practices described herein – including but not limited to Defendant's concealment of the Defect, deceptive advertising practices, and failure to provide a permanent remedy to fix the Defect – were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the Class members. Defendant's acts and practices were additionally unfair because the harm to Plaintiff and Class members is substantial and is not outweighed by any countervailing benefits

to consumers or competition. Further, Andersen's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

107. Defendant's unfair or deceptive acts or practices occurred repeatedly in the course of its trade or business and were likely to mislead a substantial portion of the purchasing public.

108. Plaintiff and Class members relied on Andersen's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less for, the Class Doors had they known the truth.

109. As a direct and proximate result of Andersen's unfair, unlawful, and deceptive practices, Plaintiff and Class members lost money or property.

110. Plaintiff lacks an adequate remedy in the absence of equitable remedies under the UCL because money damages would only compensate Plaintiff and Class members for their past purchases but would not provide an adequate remedy to prevent future harm.

111. Plaintiff and Class members seek an order enjoining Andersen from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

## COUNT III

### Violations of California's False Advertising Law

### (Cal. Bus. & Prof. Code § 17500, et seq.)

### (On behalf of Plaintiff and the California Class)

112. Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

113. Beginning at an exact date unknown to Plaintiff, but within three years preceding the filing of this Class Action Complaint, Defendant has made untrue, false, deceptive, and/or misleading statements in connection with the advertising and marketing of the Class Doors.

114. Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading, and deceptive advertising and marketing practices. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, paying less for the Class Doors, or not purchasing the Class Doors in the first place.

115. Defendant's acts and omissions are likely to deceive the general public.

116. Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq*. of the California Business and Professions Code (the "FAL").

117. The aforementioned practices, which Defendant has used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

118. Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

119. Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. The acts complained of herein occurred, at least in part, within three (3) years preceding the filing of this Class Action Complaint.

120. Plaintiff and the Class members are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading and deceptive advertising, and injunctive relief restraining Defendant from engaging in any such advertising and marketing practices in the future. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled. Plaintiff, the Class, and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

121. As a direct and proximate result of such actions, Plaintiff and the other members of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result

of such false, deceptive and misleading advertising in the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Class Doors and the price they would have paid but for Defendant's misrepresentations), which shall be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis. This amount is more than the jurisdictional minimum of this Court.

## COUNT IV

### Fraud by Concealment

### (On behalf of Plaintiff and the Nationwide Class)

122. Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

123. Defendant concealed and suppressed material facts concerning the quality, effectiveness, and weather resistance of the Class Doors and the Sills therein.

124. Defendant concealed and suppressed material facts concerning the Defect. Upon information and belief, the Defect is latent and lies in the internal mechanisms of the Class Doors. Defendant knew that Plaintiff and Class members would not be able to inspect or otherwise detect the Defect prior to purchasing the Class Doors. Defendant furthered and relied upon this lack of disclosure to promote further sales, all the while concealing the true nature and cause of the Defect from Plaintiff and Class members.

125. Defendant concealed and suppressed material facts showing that the Class Doors are defective and instead denied that the Defect exists.

126. Defendant did so in order to boost confidence in its Class Doors and falsely assure purchasers that the Class Doors were reliable, functional, weather resistant, capable of premium performance, and suitable for regular residential use. Defendant concealed information about the Defect in order to prevent harm to its business and its products' reputations in the marketplace, and to prevent consumers from learning the defective nature of the Class Doors prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Doors and because the representations and omissions played a significant role in Plaintiff and Class members' decision to purchase or lease the Class Doors.

127. Defendant had a duty to disclose the Defect in the Class Doors because: it was known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts; and Defendant knew the facts were not known to or reasonably discoverable by Plaintiff and Class members.

128. Defendant also had a duty to disclose the Defect because it made many general affirmative representations about the quality and lack of defects in the Class Doors as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, effectiveness, and weather resistance. Even when faced with complaints regarding the Defect, Defendant misled and concealed the true cause of the complained of symptoms, as seen by Plaintiff firsthand. As a result, Class members were misled as to the true condition of the Class Doors once at the time of purchase and again when the Defect was complained of to Andersen. The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Doors purchased by Plaintiffs and Class members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased, are material concerns to a reasonable consumer.

129. Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would affect the brand's image and cost money, and it did so at the expense of Plaintiff and Class members.

130. On information and belief, Defendant has still not made full and adequate disclosure and continues to mislead Plaintiff and Class members and conceal material information regarding defects that exist in the Class Doors.

131. Plaintiff and Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts, in that they would not have purchased doors designed and manufactured by Defendant or chosen different models not known to possess the Defect. Plaintiff and Class members' actions were justified. Defendant was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class members.

132. Because of the concealment and/or suppression of these facts, Plaintiff and Class members sustained damages because they paid value for the Class Doors unaware of the Defect that

Defendant failed to disclose, and many paid for service, professional assessments, temporary repairs, and parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Doors, Plaintiff and Class members would have paid less for the Class Doors or would not have purchased them at all.

133. Accordingly, Defendant is liable to Plaintiff and Class members for damages in an amount to be proven at trial.

134. Andersen's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to enrich Andersen. Andersen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT V**

**Unjust Enrichment/Restitution**

**(On behalf of Plaintiff and the Nationwide Class)**

135. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

136. Defendant has been unjustly enriched as a result of the conduct described in this Complaint, including by Plaintiff and Class members purchasing Class Doors from Defendant and/or purchasing replacement parts and services from Defendant that Plaintiff and Class members would not have purchased but for Defendant's misconduct alleged above with respect to the Defect.

137. Plaintiff and Class members unknowingly conferred a benefit on Defendant, of which Defendant had knowledge, since Defendant was aware of the defective nature of the Class Doors and the resultant performance problems, but failed to disclose this knowledge, misleading Plaintiffs and Class members regarding the nature and quality of the Class Doors while profiting from such deception.

138. Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in a false, deceptive, and misleading scheme to market the Class Doors as of premium quality, effectiveness, and weather resistance, and by engaging in the unlawful, unjust, and wrongful acts and practices described in this Complaint.

139. The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Defendant to retain the benefit of profits that it unfairly obtained from Plaintiff and Class members. These profits include the premium price Plaintiff and the Class paid for the Class Doors and the cost of the parts and services bought from Defendant to temporarily alleviate the Defect.

140. The benefits, in whole or in part, that Defendant received were not legitimately earned and came at the expense of Plaintiff and the other members of the Class.

141. Defendant knows that the above-described conduct is unjust, inequitable, and wrongful, but systematically engages in this scheme anyway in order to gain unfair advantages and reap unearned financial benefits.

142. Defendant is guilty of malice, oppression, and/or fraud through its willful and conscious disregard for the rights of Plaintiff and other Class members.

143. Plaintiff and the Class members are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

## VI. JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for a judgment against Defendant as follows:

a. Entering judgment in favor of Plaintiff against Defendant;

b. Certification of the proposed Class pursuant to Federal Rule of Civil Procedure 23;

c. Appointment of Plaintiff as Class Representative for the Class;

d. Appointment of Plaintiffs' counsel as Class Counsel;

e. A declaration that Defendant violated the California statutes that form the basis for Plaintiffs' primary statutory claims;

f. A declaration that Defendant engaged in fraudulent concealment of the Defect in violation of the common law;

g. A declaration that Andersen was unjustly enriched by its conduct as described herein;

h. Monetary damages;

i. Statutory damages in the alternative;

j. Penalties as provided by law;

k. Treble damages;

l. Restitution;

m. Injunctive relief;

n. A permanent injunction enjoining Defendant from continuing the unlawful, unjust, unfair, and deceptive acts and practices described herein;

o. Disgorgement of all monies received by Defendant as a result of the unlawful, unjust, unfair, and deceptive acts and practices described herein;

p. Pre-judgment and post-judgment interest;

q. An award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5, and as otherwise allowed by law; and

r. Such other further relief that the Court deems just and equitable.

Dated: June 18, 2026

Respectfully Submitted,

/s/ Robert Mackey

Robert Mackey (SBN 125961)
**LAW OFFICES OF ROBERT MACKEY**
660 Baker Street
Building A, Ste. 201
Costa Mesa, CA 92626
Telephone: (412) 370-9110
*bobmackeyesq@aol.com*

Matthew A. Smith (SBN 309392)
**MIGLIACCIO & RATHOD LLP**
315 Montgomery Street, Suite 900
San Francisco, CA 94104
msmith@classlawdc.com
Telephone: (202) 301-3603

*Attorneys for Plaintiff*